**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**JONATHAN A. HENDRIE,**

                                             **Petitioner,**

              **- v -**                                                        **Civ. No. 9:06-CV-370**
                                                                                              **(TJM/RFT)**

**GARY GREENE,** *Superintendent*,

                                             **Respondent**.

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

*Pro se* Petitioner Johnathan A. Hendrie brings this Petition for a Writ of *Habeas Corpus*, pursuant to 28 U.S.C. § 2254, asserting that his imprisonment is in violation of the United States Constitution.  Specifically, Hendrie alleges constitutional violations based upon: (1) the denial of his motion to suppress; (2) prosecutorial misconduct; (3) denial of a "charge-down" of the lesser-included offenses under the First-Degree Murder count; (4) an improper sentence; and (5) denial of his motion to vacate the conviction.  Dkt. No. 1, Pet. at pp. 5-6.

For the reasons that follow, the Petition is **DENIED**.

### I.  BACKGROUND

### A.  Procedural History

On February 5, 1998, Petitioner Johnathan A. Hendrie was convicted by a Clinton County Court jury of one count of Murder in the First Degree (N.Y. PENAL LAW § 125.27), one count of Murder in

1

the Second Degree (N.Y. PENAL LAW § 125.25), one count of Burglary in the First Degree (N.Y. PENAL LAW § 140.30), one count of Kidnapping in the Second Degree (N.Y. PENAL LAW § 135.20), two counts of Criminal Use of a Firearm in the First Degree (N.Y. PENAL LAW § 265.09), one count of Criminal Possession of a Weapon in the Second Degree (N.Y. PENAL LAW § 265.03), one count of Making a Punishable False Written Statement (N.Y. PENAL LAW § 215.50), one count of Menacing in the Second Degree (N.Y. PENAL LAW § 120.14(1)), and one count of Criminal Mischief in the Fourth Degree (N.Y. PENAL LAW § 145.00).  *People v. Hendrie*, 805 N.Y.S.2d 464 (N.Y. App. Div. 3d Dep't 2005).[1]

The Honorable Kevin K. Ryan, Clinton County Judge, sentenced Petitioner to the following terms of imprisonment, all of which were set to run concurrently: twenty-five (25) years to life for First Degree Murder; twenty-five (25) years to life for Second Degree Murder; twelve-and-a-half (12 ½) to twenty-five (25) years for First Degree Burglary; five (5) years for Criminal Use of a Firearm in the First Degree; seven-and-a-half (7 ½) to fifteen (15) years for Criminal Possession of a Weapon in the Second Degree; three-and-a-half (3 ½) to seven (7) years for Criminal Possession of a Weapon in the Third Degree; and one (1) year for each of his misdemeanor convictions (Making a Punishable False Written Statement, Menacing in the Second Degree, and Criminal Mischief in the Fourth Degree).  R., Sentencing Tr., dated Feb. 5, 1998, at pp. 14-16.  In addition to those concurrent sentences, Petitioner was assessed consecutive sentences of an indeterminate term of five (5) to ten (10) years of incarceration for Second Degree Kidnapping and a determinate term of five (5) years of incarceration for Criminal Use of a Firearm in the First Degree.  *Id.* at p. 17.  Thus, Petitioner was sentenced to a cumulative prison sentence of thirty-five (35) years to life.  *Id.* at p. 18.

---

[1] For reasons unknown to the Court, the State Court Records do not include a transcript of the pronouncement of the jury's verdict at trial.  *See generally* State Court Records.

On September 14, 2000, Petitioner filed a motion to vacate the judgment of conviction, pursuant to N.Y. CRIM. PROC. L. § 440.10, on the ground that newly discovered evidence undermined the conviction. R., Pet'r § 440 Mot., dated Sept. 14, 2000. The trial court denied Petitioner's § 440 motion in all respects. R., Decision/Order on § 440 Mot., dated Aug. 14, 2001. Thereafter, Petitioner appealed his conviction as well as the trial court's denial of his § 440 motion to the New York State Supreme Court, Appellate Division, Third Department, which modified his conviction by reversing his conviction for Criminal Use of a Firearm in the First Degree and vacating the five (5) year consecutive sentence attached to that conviction. *People v. Hendrie*, 805 N.Y.S.2d at 470-71. The Appellate Division affirmed Petitioner's other convictions as well as the trial court's denial of his § 440 motion. *Id.* Petitioner's application for leave to appeal that decision was denied. *People v. Hendrie*, 6 N.Y.3d 776 (2006).

Petitioner filed the instant *Habeas* Petition on March 23, 2006. Dkt. No. 1, Pet.

### B. Summary of the Evidence Presented at Trial

Petitioner and Helen LaPorte lived together "on and off" shortly after they met in the early 1990s until February 1996, when they moved into an apartment at 87 Blackman Corners Road, located in Mooers Forks, New York. R., Trial Tr., dated Nov. 17-24, 1997, at pp. 578-84. In July 1996, they had an argument and LaPorte moved into her ex-husband's house along with her three children for three days. *Id.* at p. 587. During that time, LaPorte obtained an order of protection against Petitioner and, upon her return to the apartment, Petitioner moved out. *Id.* at pp. 588 & 591. However, LaPorte testified that Petitioner continued to harass her by constantly calling and threatening her on the phone. LaPorte reported the calls to the police, who twice arrested Petitioner. *Id.* at pp. 591-92.

Two different witnesses testified that after Petitioner and LaPorte broke up, Petitioner told them

3

he was contemplating committing violent acts. Petitioner's friend Russell Macey testified that Petitioner said he was going to "do Helen in and he was going to take and do her boyfriend in and then that he was going to take and do himself in." *Id.* at p. 516. Likewise, Petitioner's brother-in-law, Michael Burnell, testified that Petitioner told him he wanted to reconcile with LaPorte and that if he had a gun he would kill LaPorte, her family, and himself. *Id.* at p. 719.

On December 21, 1996, Petitioner called LaPorte and told her he wanted to bring a Christmas present over to her children. *Id.* at p. 598. After conferring with her boyfriend, Robert Lamberton (a/k/a "Timmy"), LaPorte agreed to allow Petitioner to pull into her driveway to drop off the gift, which he indicated was heavy. *Id.* at p. 600. Thereafter, Petitioner parked in the driveway and approached the front doorway with a wrapped box in hand, where LaPorte awaited him. *Id.* at pp. 606-07. When LaPorte went to take the box, Petitioner reached through the wrapping, pulled out a shotgun, pointed it at LaPorte, and forced her back into the house. *Id.* at pp. 607-08.

While Lamberton maintained his position at the kitchen table, Petitioner and LaPorte began to argue and push each other. *Id.* at p. 609. Petitioner produced a piece of rope and ordered LaPorte to tie up Lamberton, an order LaPorte refused. *Id.* Petitioner and LaPorte continued to yell and struggle with each other, and at one point Petitioner told Lamberton, "You will never fucking love her as much as I do." *Id.* at p. 610. At some point shortly thereafter, Petitioner shot Lamberton, prompting LaPorte to "attack" Petitioner, who pushed her out of the way and left the room, apparently in search of Lamberton, who was no longer in the kitchen. *Id.* at pp. 612-13. At that point, LaPorte answered a telephone call from her son's friend and immediately instructed him to tell his mother to call the police. *Id.* at p. 613. After Petitioner left the room, he ran from the house and smashed the telephone box with the gun, disabling the phone connection. *Id.* at pp. 1350-51 & 1381-82.

4

Then, LaPorte went upstairs and tried unsuccessfully to open the bathroom door, which was blocked by Lamberton, who was laying against it.  *Id.* at p. 613.  LaPorte testified that Petitioner approached her from behind and pulled her down the stairs, telling her she was going to go with him. *Id.* at p. 614.  Petitioner forced LaPorte into his car and drove her to a wooded area.  *Id.* at pp. 615-16. Petitioner told LaPorte he wanted her to stay the night with him in the woods and read letters he had written.  *Id.* at p. 617.  After LaPorte read his letter, Petitioner allowed her to leave in his car; LaPorte drove to her sister's home and they called the police.  *Id.* at p. 621.

Around eight o'clock p.m., New York State Trooper Scott Leidner responded to a domestic assault call at 87 Blackman Corners Road and, after waiting for backup, entered the house and found blood and a body in the upstairs bathroom.  *Id.* at pp. 839-41 & 846-47.  Thereafter, investigators encountered Petitioner behind his sister's trailer home.  Investigator Jonathan Denny arrested him and advised him of his *Miranda* rights.  *Id.* at p. 1016.  At some point either before or after his rights were read to him, Petitioner, who was crying, said that he was sorry and didn't mean to kill anybody.  *Id.* at pp. 1017-18.  Petitioner was subsequently interviewed at the Plattsburgh State Police barracks, where he confessed to bringing a loaded, sawed-off shotgun to LaPorte's home and that he "threw the gun up and it went off," striking Lamberton.  *Id.* at p. 1073.  After concluding the interview, investigators typed Petitioner's statement and read it aloud with him.  Petitioner asked the investigator to make three changes to the statement, initialed each page, and signed it.  *Id.* at pp. 1084-85.  Petitioner also drew a map of the wooded area where he took LaPorte and described to Investigator Richard Sypek where he left the shotgun, which was recovered in the early morning hours of December 22, 1996.  *Id.* at pp. 759 & 788.

Dr. Barbara Wolf performed an autopsy of Lamberton's body, determining the cause of death

to be internal bleeding caused by shotgun wounds.  *Id.* at p. 1157.  However, Dr. Wolf also testified that Lamberton sustained a blunt impact wound to the back of his head which was consistent with being struck with the barrel of a shotgun, and that substantial bleeding in the area of the wound indicated Lamberton received the blow prior to his death.  *Id.* at p. 1177.

Petitioner took the stand in his own defense.  He testified that after he entered LaPorte's home, he and LaPorte fought each other and "were pulling [back and forth] on the gun and the gun went off." *Id.* at pp. 1348-49.  Petitioner also stated that at the time the gun went off, he did not know Lamberton's location and never threatened to shoot him.  *Id.* at p. 1350.  Petitioner stated that after the shot was fired, he did not look for Lamberton and never went upstairs.  *Id.* at pp. 1350-52.

Psychologist Dr. Sally Summerell testified on Petitioner's behalf, asserting that she evaluated Petitioner for Social Security benefits in 1992, and at that time determined his IQ to be within the range of "mild retardation."  *Id.* at pp. 1037-38.  Summerell opined that it "is very unlikely" Petitioner would have understood the *Miranda* warnings, and that she doubted his ability to create and carry out a "realistic" plan.  *Id.* at pp. 1039 & 1052-56.

## II.  DISCUSSION

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application, of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts

6

in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

The petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234697, at *3 (S.D.N.Y. Aug. 28, 2003). The AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d at 66; *Boyette v. LeFevre*, 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams and Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

## B. Denial of Motion to Suppress Post-Arrest Statements

Petitioner asserts the trial court erroneously denied his motion to suppress his post-arrest statements to police because he was not "mentally competent to waive his" *Miranda* rights. Pet. at p.

7

5.   Under *Miranda v. Arizona*, 384 U.S. 436 (1966), before a suspect may properly be subjected to custodial interrogation, he must be informed that he has the right to remain silent, that any statement he makes may be used in evidence against him, and that he has the right to have counsel present.  384 U.S. at 467-72; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000) (citing *Miranda*). Generally, statements obtained in violation of *Miranda* must be suppressed.  *See Dickerson v. United States*, 530 U.S. at 443-44 ("[U]nwarned statements may not be used as evidence in the prosecution's case in chief.").  However, the rights *Miranda* seeks to protect may be waived if the waiver is knowing, voluntary, and intelligent; "the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (internal quotation marks and citations omitted).

The Honorable Patrick R. McGill, Clinton County Court Judge, addressed the admissibility of Petitioner's post-arrest statements during a pre-trial *Huntley* hearing held on October 6, 1997.  R., Huntley Hr'g Tr., dated Oct. 6, 1997; *see People v. Huntley*, 15 N.Y.2d 72 (1965) (adopting a procedure for providing a separate hearing about the voluntariness of a confession to be offered in evidence against a defendant at his or her trial).  Under the AEDPA, a state court's factual findings at a suppression hearing are presumed to be correct, and the petitioner has the burden of overcoming that presumption by clear and convincing evidence.  *See Campbell v. Greene*, 440 F. Supp. 2d 125, 141 (N.D.N.Y. 2006) (McCurn, S.J.); *James v. Walker*, 2003 WL 22952861, at *2 & 6 (E.D.N.Y. Aug. 28, 2003), *aff'd*, 116 Fed. Appx. 295, 297 (2d Cir. 2004) (unpublished opinion).  Notwithstanding the deference accorded to factual determinations, "legal questions, such as whether a defendant has effectively waived his federal constitutional rights in a proceeding, are governed by federal standards." *Oyague v. Artuz*, 393

8

F.3d 99, 104 (2d Cir. 2004) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).  Petitioner bears the burden of establishing that his rights were violated.  *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997).

Judge McGill made the following findings of fact at the *Huntley* hearing: Investigators Jon Denny and Richard Sypek drove to the residence of Mary Fleury, Petitioner's ex-girlfriend, at about two a.m. on December 22, 2006.  R., Huntley Decision/Order at p. 2.  Investigator Denny apprehended Petitioner after encountering him behind Fleury's trailer home, during which time Petitioner "was crying and repeatedly stating that he was sorry and that he had not intended to kill anyone." *Id.* at pp. 2-3.  Denny summoned Investigator Sypek, who went to obtain handcuffs from the car, during which time Denny read Petitioner his *Miranda* rights.  *Id.* at p. 3.  On the way to the police barracks, Sypek read Petitioner his *Miranda* rights a second time and Petitioner, "who was upset, but lucid, stated that he understood his rights and agreed to speak with Investigator Sypek when they arrived at the police station." *Id.*  At the police station, Petitioner was taken to an office where he was interviewed.  *Id.* Petitioner was readily cooperative and forthcoming during the questioning, which lasted approximately two hours.  *Id.* at p. 5.  An investigator typed a statement based on Petitioner's oral admissions, which was read aloud to Petitioner as he read along, and then Petitioner initialed each page of the document and signed it.  *Id.* at p. 5. After Petitioner signed the statement, it was read back to him a final time, during which reading Petitioner requested certain changes be made to its wording.  *Id.* at p. 6.

The trial court gave little weight to the testimony of Dr. Sally Summerell, who testified that Petitioner did not have the mental capacity to understand the meaning of the *Miranda* warnings, because her opinion was based on only one interview with him, "[s]he was not given access to his records," and she was falsely told by Petitioner's mother that he could not read.  *Id.* at p. 4.  The trial court found that

9

Petitioner could read, albeit slowly and with some difficulty, and that he "had written several suicide notes which his mother brought to the police station the night of the interview." *Id.* at p. 5.

Based on the above findings of fact, the trial court arrived at the legal conclusion that Petitioner's statements were voluntary and that he had voluntarily waived his constitutional right against self-incrimination. *Id.* at pp. 6-7. The Appellate Division affirmed such ruling, holding that notwithstanding evidence that Petitioner's IQ placed him at the low end of the mild mental retardation range, "[s]ubnormal intelligence, in and of itself, does not require suppression of statements where it is established that a defendant had the ability to understand the basic concepts of the right to remain silent, the right to the assistance of counsel and the fact that any statement could be used against him or her." *People v. Hendrie*, 805 N.Y.S.2d at 468. The Appellate Division went on to state that "the record lacks any indicia that defendant failed to sufficiently comprehend the warnings undisputedly given to him by the State Police." *Id.*

The fact of a defendant's low intelligence does not, *ipso facto*, create an invalid waiver. *See Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988) ("A waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity."). Rather, the pertinent question is to what extent a defendant's mental capacities inhibit a knowing, voluntary, and intelligent waiver. *Id.* (noting that petitioner's psychological disorder did not indicate an inability to "comprehend sufficiently the rights set forth in *Miranda*"); *see also Maldonado v. Greiner*, 2003 WL 22435712, *34 (S.D.N.Y. Oct. 28, 2003) ("Despite [petitioner's] alleged low intelligence, he was able to understand the *Miranda* rights when they were given to him.").

In this case, Petitioner has failed to produce clear and convincing evidence rebutting the trial court's factual determination that he had the mental capacity to understand the *Miranda* warnings. The

10

trial court found the testimony of Dr. Summerell not credible because her evaluation was based on a single interview, conducted six years earlier, during which Petitioner's mother answered most of the questions, and because she did not have access to his school records at the time of that 1992 interview. R., Huntley Decision/Order at p. 4. There is no basis to question the trial court's credibility assessment. Furthermore, the testimony showed that Petitioner was twice read his *Miranda* rights prior to his interview, and that during his interview, though upset, he answered the questions in a forthright manner and "elaborate[d] as to the details" in his answers. R., Huntley Hr'g Tr. at pp. 40 & 79. Finally, although Petitioner contends he is "functionally illiterate," the testimony at trial revealed that he was able to write several suicide notes and letters to family, friends, and Helen LaPorte, that he was able to follow his confession statement as it was read back to him, and that he offered corrections to the content of the statement after it was read back to him a second time. R., Trial Tr. at pp. 619, 1061-63, 1339-43, & 1354. Thus, the Appellate Division's decision that Petitioner made a knowing, intelligent, and voluntary waiver of his *Miranda* rights was not an erroneous application of federal law.

For those reasons, the Petition is **denied** on this ground.

### C. Prosecutorial Misconduct

Petitioner contends that a comment made by the prosecution during summations improperly shifted the burden of proof, violating his right to a fair trial. Pet. at p. 5. During summation, the prosecutor attempted to explain why the jury should believe the testimony of Helen LaPorte, not Petitioner, framing the ultimate issue as follows: "If you believe Helen, [Petitioner] is guilty of all these crimes. *They have not suggested any reason not to believe Helen about those details*." Trial Tr. at p. 1556. Petitioner's trial attorney did not immediately object to the comment, but rather, in a motion for mistrial which preceded the jury charge, made a general accusation that the prosecution improperly

shifted the burden of proof. *Id.* at pp. 1583-86. On direct appeal, Petitioner took specific issue with the prosecutor's statement italicized above, so the Court assumes that comment is the basis for his present constitutional claim. The Appellate Division found the prosecutor's comment improper, but held that "in view of the County Court's instructions to the jury concerning the burden of proof," the "brief, isolated comment" did not deny him his "right to a fair trial." *People v. Hendrie*, 805 N.Y.S.2d at 468.

For *habeas* relief to be granted based on a claim of prosecutorial misconduct, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In considering such claims, courts focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Since a defendant's right to a fair trial is clearly established, *see Williams v. Walker*, 2001 WL 1252105, at *2 (E.D.N.Y. Oct. 31, 2001); *Porter v. Kelly*, 2000 WL 1804545, at *4 (E.D.N.Y. Dec. 5, 2000); *Concepcion v. Portuondo*, 1999 WL 604951, at *4 (S.D.N.Y. Aug. 10, 1999), Hendrie may prevail on this ground for relief only if he demonstrates that the Appellate Division's adjudication of his claim alleging prosecutorial misconduct is either contrary to, or involved an unreasonable application of, Supreme Court precedent.

When, as here, a prosecutorial misconduct claim is predicated upon statements made at summation, *habeas* relief is available only if Petitioner "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994)). To determine whether a prosecutor's conduct

caused substantial prejudice, a *habeas* court should consider: (1) the severity of the misconduct; (2) the measures adopted by the trial court to cure the misconduct; and (3) the certainty of conviction absent the prosecutor's remarks. *See Williams v. Duncan*, 2007 WL 2177075, at *26 (N.D.N.Y. July 27, 2007) (citing, *inter alia, Bently v. Scully*, 41 F.3d at 824).

In this case, the prosecutor's improper remark constituted an "isolated, aberrant incident of prosecutorial misconduct in an otherwise fair proceeding." *Rasmussen v. Filion*, 2005 WL 318816, at *9 (W.D.N.Y. Feb. 9, 2005). Although improper, the prosecutor's comment was isolated and brief. *See, e.g., Wright v. Conway*, 2009 WL 3273901, at *16 (E.D.N.Y. Oct. 9, 2009) (finding prosecutor's improper burden-shifting comment to be isolated and non-severe); *see also Tobias v. Portuondo,* 367 F. Supp. 2d 384, 397 (W.D.N.Y. 2004) (holding that two isolated improper burden-shifting comments did not violate due process when the prosecutor's summation, as a whole, was not inflammatory and the trial judge gave curative instructions).

Secondly, because Petitioner's attorney did not object to the prosecutor's summation, the trial court did not have the opportunity to give an immediate curative instruction regarding the impropriety of the comment. However, the trial court gave an extensive charge clarifying that the burden of proof beyond a reasonable doubt lies with the prosecution alone:

> A defendant is never required to prove anything. On the contrary, the People, having accused the defendant of the crimes charged, have the burden of proving the defendant guilty beyond a reasonable doubt. The People have the burden of proving the defendant's guilt as to every fact and every element essential to conviction. The burden never shifts. It remains with the people. And the presumption of innocence remains with every defendant from the beginning of the trial until such time when, during final deliberations, the jury may be convinced that the People have proved the defendant's guilty beyond a reasonable doubt.

Trial Tr. at p. 1598.

The above instruction "likely corrected any misperception the jury may have held" regarding the burden of proof. *Chalmers v. Mitchell*, 73 F.3d 1262, 1271 (2d Cir.), *cert. denied*, 519 U.S. 834 (1996).

Finally, the evidence presented against Petitioner at trial was substantial. Petitioner's confession and his own testimony established that he brought a loaded, sawed-off shotgun to LaPorte's home and shot Lamberton. Subsequent testimony established Lamberton's death was caused by the gun shot. As such, the crucial question for the jury was Petitioner's intent. In that respect, there was substantial evidence that the murder was intentional and premeditated.

Two witnesses testified that Petitioner told them prior to the December 21, 1996, that he intended to kill Lamberton, LaPorte, and himself. Trial Tr. at pp. 516 & 719. Petitioner's mother testified that a few days prior to the shooting, Petitioner asked her to drive him to a wooded area, drop him off, and return to get him in an hour. *Id.* at pp. 552-55. Prior to his arrival at LaPorte's house with a loaded shotgun concealed inside a gift-wrapped box, Petitioner gathered various camping supplies: a sleeping bag, backpack, heater, flashlight, etc. *Id.* at pp. 558-61 & 623. Petitioner testified that after the gun fired, he ran from the house and smashed the telephone box with the gun, disabling the phone connection. *Id.* at pp. 1350-51 & 1381-82. Finally, the coroner testified that although a shotgun wound caused Lamberton's death, he also sustained, prior to his death, a blow to the back of his head which was consistent with being struck with the barrel of a shotgun. *Id.* at p. 1177.

Given the isolated nature of the prosecutor's improper comment, the trial court's curative instructions, and the amount of evidence against Petitioner, the Court cannot conclude that he was prejudiced by the comment, nor that such comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181. Thus, the Appellate Division did not err in concluding that the prosecutor's comment did not violate Petitioner's

14

due process right to a fair trial.

Therefore, the Petition is **denied** on this ground.

### D.  Denial of Lesser-Included Offenses in the Jury Charge

Petitioner alleges the trial court violated his due process rights when it denied his request to charge the jury with First and Second Degree Manslaughter and Criminally Negligent Homicide as lesser included offenses under the First Degree Murder count.  On direct appeal, Petitioner framed his argument as follows:

> In view of [Petitioner's] statements to police that he didn't intend to kill Lamberton, his trial testimony that the fatal shooting was the accidental result of the struggle with LaPorte over the gun, issues of fact existed as to whether he acted with a culpable mental state other than intent to kill.  By denying Mr. Hendrie's request to charge the lesser included offenses, [the] county court invaded the province of the jury by foreclosing any consideration of whether, if Mr. Hendrie was culpable, he was responsible for something less than an intentional homicide.

R., Pet'r App. Div. Br. at p. 34.

The Appellate Division rejected Petitioner's argument that First Degree Manslaughter should have been included in the charge, but agreed that Second Degree Manslaughter "should have been charged under the first degree murder count."  *People v. Hendrie*, 805 N.Y.S.2d at 469.  However, the Appellate Division found such error harmless because the trial court charged Second Degree Manslaughter as a lesser included offense under the depraved indifference Second Degree Murder count, which the jury rejected.  *Id.*  Finally, the Appellate Division found "no error in County Court's refusal to charge criminally negligent homicide as a lesser included offense," because Petitioner must have recognized the substantial unjustifiable risk of death when he produced a "loaded sawed-off shotgun with a light-pull trigger and pointed it directly at other people."  *Id.*

As Respondent notes, the Supreme Court has not determined whether the Constitution requires

15

that a lesser included offense be included in a jury charge in a non-capital case. *Beck v. Alabama,* 447 U.S. 625, 638 n. 14 (1980) (declining to "decide whether the Due Process Clause would require the giving of such instructions in a noncapital case"). In *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996), the Second Circuit denied a *habeas* petitioner's claim that the lesser included offense should have been included in the jury charge because "a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule," a practice that the Supreme Court expressly disallowed in *Teague v. Lane*, 489 U.S. 288, 316 (1989) (establishing the "non-retroactivity rule" that a *habeas* petitioner cannot rely on a rule of federal law that is not announced until after the time his conviction became final; stating that "habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review" (emphasis in original)).[2] Therefore, pending the pronouncement of a new constitutional rule, a claim based on an alleged error to charge a lesser included offense is not cognizable in a *habeas* proceeding because absent such a rule, there is no basis to find an unreasonable application and/or violation of clearly established federal law. *See, e.g.*, *Mills v. Girdich*, 614 F. Supp. 2d 365, 382 (W.D.N.Y. 2009); *Smith v. Barkley*, 2004 WL 427470, at *5 (N.D.N.Y. Feb. 18, 2004).

  For these reasons, the Petition is **denied** on this ground.

---

  [2] The Second Circuit also held in *Jones v. Hoffman* that "neither of the two narrowly drawn exceptions to *Teague*" applied because "[t]he lesser-included offense rule does not decriminalize a particular class of conduct, nor does it fall within that small core of 'watershed' rules requiring the observance of certain procedures that are implicit in the concept of ordered liberty." 86 F.3d at 48.

  The non-retroactivity rule announced in *Teague* was later codified by the AEDPA's § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 379 (2000).

### E.  Improper Sentence

Petitioner challenges the trial court's assessment of a consecutive sentence on his kidnapping conviction.  Respondent argues that this claim is unexhausted and therefore not cognizable on *habeas* review.

A review of Petitioner's convictions and sentences is necessary.  Petitioner was convicted of the following crimes: First Degree Murder, Second Degree Murder, First Degree Burglary, Second Degree Kidnapping, Criminal Use of a Firearm in the First Degree, Criminal Possession of a Weapon in the Second and Third Degrees, Making a Punishable False written Instrument, Criminal Contempt in the Second Degree, Menacing in the Second Degree, and Criminal Mischief in the Fourth Degree.  *People v. Hendrie*, 805 N.Y.S.2d 464.  Judge Ryan sentenced Petitioner to concurrent terms of twenty-five (25) years to life imprisonment for the First and Second Degree Murder convictions, and concurrent sentences not exceeding that amount for all his remaining convictions except for Second Degree Kidnapping and Criminal Use of a Firearm in the First Degree, for which he received consecutive sentences of five (5) to ten (10) years and five (5) years incarceration, respectively.  R., Sentencing Tr. at pp. 14-17.

On direct appeal, Petitioner argued that the kidnapping charge served as the predicate for the second degree felony-murder charge, and therefore, that the kidnapping charge could not run consecutively to that charge pursuant to N.Y. Penal Law § 70.25(2).  R., Pet'r App. Div. Br. at p. 41. The Appellate Division agreed with Petitioner "that Penal Law § 70.25(2) prevents the County Court from imposing consecutive sentences for kidnapping and murder in the second degree based on the underlying felony of kidnapping" but did "not perceive that this error affects the length of defendant's sentence as he makes no argument that the County Court improperly made the kidnapping sentence

17

consecutive to any other crimes for which he was convicted." *People v. Hendrie*, 805 N.Y.S.2d at 470.[3]

Respondent argues Petitioner failed to exhaust this claim because (1) he did not raise this issue in federal constitutional terms before the state courts and (2) the argument he raised before the Appellate Division was not the same argument included in his leave application to the Court of Appeals. Dkt. No. 10, Resp't Mem. of Law at pp. 30-31.

A state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for *habeas corpus*. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To satisfy the exhaustion requirement with respect to a claim, a defendant must "present the substance of the same federal constitutional claim[s]" to the state courts "that he now urges upon the federal courts[.]" *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (internal quotation marks omitted) (citing *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001)). "A federal constitutional claim has not been fairly presented to the State courts unless the petitioner has informed those courts of all the 'essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" *Id.* (citing *Daye v. Att'y Gen. of the State of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (further citing *Picard v. Connor*, 404 U.S. 270, 276-277 (1971)).

However, a claim may be "fairly present[ed] to the state courts[,] . . . without citing chapter and verse of the Constitution," if there is: (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion

---

[3] Petitioner also argued on direct appeal that the trial court improperly imposed a consecutive sentence for the criminal use of a firearm conviction because that crime was subsumed into the First Degree Burglary conviction. *People v. Hendrie*, 805 N.Y.S.2d at 469. The Appellate Division agreed that the sentence imposed for Criminal Possession of a Firearm in the First Degree was subsumed by the elements of the First Degree Burglary charge, and vacated the five (5) year consecutive sentence imposed for that crime. *Id.* at 469-70.

of the claim in terms so particular as to call to mind a specific right protected by the Constitution, or

(d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.  *Daye v. Att'y Gen. of the State of New York*, 696 F.2d at 191; *see also Smith v. Duncan*, 411 F.3d 340, 348 (2d Cir. 2005).

A review of Petitioner's Brief submitted to the Appellate Division shows that he did not present this issue in federal constitutional terms, nor did he rely on cases employing constitutional analysis. R., Pet'r App. Div. Br. at pp. 40-43.  In addition, Petitioner's claim does not have obvious federal constitutional overtones as it focuses on the trial court's alleged mistake in sentencing under the strictures of New York law.  Respondent is therefore correct that Petitioner did not present this claim before the state courts as a federal constitutional violation.[4]

However, Petitioner also does not appear to raise this claim as a violation of federal constitutional law in his present *Habeas* Petition.  Indeed, in contradistinction to his other claims, Petitioner implicates and mentions no federal constitutional issue(s) with respect to the sentence he received.  *See* Pet. at p. 6.  Rather, his argument rests on the trial court's alleged improper sentencing pursuant to New York State law.  To the extent Petitioner proffers the instant claim based solely on a misapplication of state law, such a claim does not constitute a viable basis for *habeas* relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law." (citation omitted)).

Moreover, the Appellate Division's ruling that the sentence, while partly erroneous under state law, did not require revision, was correct.  Petitioner was convicted of two separate counts of felony

---

[4] Because Petitioner did not properly exhaust this claim for failure to raise the issue in federal constitutional terms, the Court need not address Respondent's second exhaustion argument that Petitioner raised a separate and distinct claim in his leave application.

19

murder, one in the first degree and another in the second degree.  The underlying felony for the First

Degree Murder conviction was burglary; while the underlying felony for the Second Degree Murder

charge was kidnapping.  R. on Appeal, Vol. I, Indictment, dated Mar. 6, 1997, at pp. 1-2 & Vol. III,

Trial Tr. at pp. 1617-35 (jury charge).[5]  Pursuant to N.Y. PENAL LAW § 70.25(2), consecutive sentences

cannot be imposed when one crime is an element of another.  As the Appellate Division held, because

kidnapping  was  the  predicate  for  Petitioner's  Second  Degree  Murder  conviction,  Petitioner's

kidnapping sentence could not run consecutively to his Second Degree Murder sentence.  However,

because burglary was the predicate felony for Petitioner's First Degree Murder conviction, N.Y. PENAL

LAW § 70.25(2) did not prohibit the trial court from setting the kidnapping sentence to run consecutive

to that crime.  Moreover, the trial judge could have sentenced Petitioner to life without parole on the

First Degree Murder conviction alone.  N.Y. PENAL LAW §§ 70.00(2)(a), (3)(a)(1), & 125.27.  Because

the sentence imposed was within the range prescribed by state law, Petitioner has raised no federal

constitutional violation.  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted).

Finally, to the extent that Petitioner's claim could arguably be viewed as a challenge under the

Eighth Amendment's prohibition of cruel and unusual punishment, that claim also fails.  The Eighth

---

[5] The Indictment included one count of First Degree Murder, based on a felony-murder theory with burglary being the underlying felony.  It also brought two counts of Second Degree Murder, both based on a felony-murder theory, with burglary and kidnapping being the underlying crimes.  R. on Appeal, Vol. I, Indictment, dated Mar. 6, 1997, at pp. 1-3.  The Indictment brought second degree felony-murder charges based on both burglary and kidnapping, but the first degree felony-murder charge was based solely on the burglary felony.  The trial court instructed the jury that if they found Petitioner guilty of First Degree Murder, they would consider the second degree felony-murder charge only as to the underlying felony of kidnapping, not burglary.  R. on Appeal, Vol. III, Trial Tr. at pp. 1617-35 (jury charge).  Thus, because Petitioner was convicted of First Degree Murder with burglary being the underlying felony, kidnapping was necessarily the underlying felony for his Second Degree Murder conviction.  *Id.*; *see also People v. Hendrie*, 805 N.Y.S.2d at 470 (noting that the underlying felony for the Second Degree Murder conviction was kidnapping).

Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer v. Andrade,* 538 U.S. 63, 72-73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991). It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense. *See White v. Keane*, 969 F.2d at 1383; *Lou v. Mantello*, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001). The Supreme Court has held that, for offenses less than manslaughter, sentences longer than 25 years are not grossly disproportionate. *See Staubitz v. Lord*, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006) (citing *Ewing v. California*, 538 U.S. 11 (2003) (25 years to life for grand theft) and *Harmelin*, 501 U.S. 957 (1991) (life in prison without the possibility of parole for cocaine possession)).

Petitioner's sentence was not contrary to or an unreasonable application of that precedent. Since the sentence imposed was plainly within the limits authorized by statute, and was not grossly disproportionate to the crime of conviction, the Petition is **denied** this ground.

### F. Denial of Hendrie's § 440 Motion

In his fifth and final ground for *habeas* relief, Petitioner asserts that the trial court's "[s]ummary denial of [his] post-judgment motion to vacate judgment of conviction deprived petitioner of due process." Pet. at p. 6. Petitioner further states that his "motion papers proffered facts not discoverable with due diligence prior to trial . . . which, if presented to [the] jury, might have resulted in a different verdict." *Id.*

On September 14, 2000, prior to perfecting his direct appeal, Petitioner filed a motion to vacate his conviction pursuant to N.Y. CRIM. PROC. L. § 440.10(1)(g), which provides a vehicle for defendants

to collaterally attack their convictions based on the discovery of new evidence.[6]  R. on Appeal, Vol. III, Pet'r § 440 Mot., dated Sept. 14, 2000.  The basis for Petitioner's § 440 motion was that he had found two witnesses, Jay and Janet Jeanette, whose location was previously unknown, who would have testified that Helen LaPorte told them that she and petitioner were struggling when the gun went off, she willingly went to the woods with Petitioner, and "she was going to put [Petitioner] away so she would not have to be bothered with him any more."  *Id.*, Jay and Jean Jeanette Aff., dated Feb. 12, 2000, at ¶ 3.[7]  The Jeanettes furnished such testimony to the trial court in a joint Affidavit attached to Petitioner's § 440 Motion.  *Id.*  Petitioner's trial attorney, Livingston L. Hatch, Esq., also submitted an Affidavit stating that he knew the Jeanettes were potential witnesses prior to trial, but was unable to locate them at that time.  *Id.*, Livingston L. Hatch, Esq., Aff., dated Sept. 28, 2000, at ¶ 3.

The trial court denied Petitioner's motion, ruling that the Jeanettes' proffered testimony  was not "newly discovered" evidence because "[i]t was known to the defendant's attorney prior to trial," and "the substance of their statement was known to [Petitioner's trial attorney] before and during the trial."  R. on App., Vol. III, County Court Decision/Order, dated Aug. 1, 2001, at p. 3.  Furthermore, the trial court found Petitioner had

---

[6] N.Y. CRIM. PROC. L. § 440.10(1)(g) allows a defendant to collaterally attack a judgment where:

New evidence has been discovered since the entry of a judgment based upon a verdict of guilty at trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based on such ground must be made with due diligence after the discovery of such alleged new evidence.

[7] The Jeanettes' Affidavit was supported by three Exhibits, which are in sum and substance additional statements made by the Jeanettes about LaPorte's alleged comments to them.  R. on Appeal, Pet'r § 440 Mot., Jay and Jean Jeanette Aff., Exs., dated July 15, July 21, & Oct. 16, 1998.

22

failed to demonstrate that this evidence could not have been produced at trial even with the exercise of due diligence. Defense counsel did not ask the Court for assistance in locating these people at any time prior to or during the trial, or for an adjournment to attempt to do the same. Finally, the defendant has not demonstrated that this evidence, if admitted at trial, would have resulted in a more favorable verdict since it merely impeaches Ms. LaPorte's trial testimony.

*Id.* (internal citations and quotation marks omitted).

The Appellate Division affirmed the trial court's decision for the same reasons. *People v. Hendrie*, 805 N.Y.S.2d at 470.

The Supreme Court has held that "newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Claims of actual innocence based on newly discovered evidence constitute a valid basis for *habeas* relief only when there is "an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In this case, Petitioner fails to explain how the trial court's denial of his § 440 motion violated his constitutional due process rights.

In addition, the trial court's determination that the Jeanettes' statements did not constitute "newly discovered evidence" was based on a factual determination that prior to and during trial, Petitioner's counsel knew that the Jeanettes were potential witnesses and did not employ due diligence to discover their location and produce them at trial.[8] The state court's factual rulings are presumed to be correct and can be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has offered no evidence to rebut the trial court's factual conclusions. Thus, there is no basis to conclude that the trial court's denial of Petitioner's § 440 motion violated state law, much less that

_____

[8]Petitioner does not allege that he was provided constitutionally deficient representation from his attorney. *See generally* Pet.

it somehow ran afoul of the Constitution.  *See, e.g.*, *Morris v. Duncan*, 2007 WL 2815632, at *12 (N.D.N.Y. Sept. 25, 2007) (doubting petitioner's claim that the evidence forming the basis for his motion to vacate was in fact "newly discovered evidence" given the availability of such evidence prior to trial).

Finally, to the extent Petitioner's claim is based on the trial court's decision not to hold a hearing before deciding his § 440 motion, claims of procedural defects in state post-conviction proceedings do not state a valid basis for *habeas* relief.  *Robertson v. Artus*, 2008 WL 553200, at *11 (N.D.N.Y. Feb. 27, 2008) (citing *Jones v. Duncan*, 162 F. Supp. 2d 204, 217-18 (S.D.N.Y. 2001) ("All the circuits that have considered the issue, except one, have held that federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." (internal citations and quotation marks omitted))).[9]

For these reasons, the Petition is **denied** on these grounds.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that the Petition for a Writ of *Habeas Corpus* (Dkt. No. 1) is **DENIED**; and it is further

**ORDERED**, that because the Court finds Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability will issue with respect to any of Petitioner's claims.  *See* 28 U.S.C. § 2253(c)(2) ("A certificate of

---

[9] The Second Circuit has not explicitly addressed whether a procedural violation in a post-conviction proceeding is a valid basis for *habeas* relief, however, district courts in this Circuit have repeatedly followed the majority rule.  *Jones v. Duncan*, 162 F. Supp. 2d at 218 (citing cases); *see also Dexter v. Artus*, 2007 WL 963204, at *17 (N.D.N.Y. Mar. 27, 2007) (joining majority position).

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000) *cert. denied* 531 U.S. 873 (2000).

**DATED:**March 3, 2010

Thomas J. McAvoy
Senior, U.S. District Judge